IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| SUSAN H. DUTHIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 11-0291-N |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Plaintiff files this appeal from the Commissioner's denial of her claim for a period of disability and disability insurance benefits. The parties have consented (doc. 18) to the exercise of jurisdiction by the Magistrate Judge and this case has been referred (doc. 19) to the undersigned to conduct all proceedings and order the entry of judgment. Oral argument was held before the undersigned on May 2, 2012, at which Attorney Colin Kemmerly appeared on behalf of the plaintiff and Assistant United States Attorney Patricia Beyer represented the Commissioner. After careful consideration of the record, including the briefs of the parties and the arguments of counsel, it is ORDERED that the decision of the Commissioner be upheld and judgment entered for the Commissioner.

Plaintiff filed her administrative claim on April 18, 2007; it was denied administratively on June 27, 2007, and plaintiff timely filed a Request for Hearing. The hearing was held before the Administrative Law Judge ("ALJ") on March 4, 2009, but was continued to allow plaintiff to talk to an attorney. A supplemental hearing was held on May 1, 2009, at which plaintiff was represented by counsel. The ALJ issued an unfavorable decision on August 4, 2009, and the

Appeals Council denied plaintiff's request for review on April 29, 2011.  The denial of benefits thus became the final decision of the Commissioner.

## Claims Presented

1. The ALJ's Residual Functional Capacity determination was not supported by substantial evidence, as the ALJ rejected the opinions of plaintiff's treating physician and substituted her judgment for that of the treating physician, and did not seek clarification from physician.
2. The ALJ erred in finding plaintiff had the RFC to perform light work despite finding that plaintiff had limitations less than full range of light work.

## Legal Standard

### Scope of Judicial Review

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. Washington v. Astrue, 558 F.Supp.2d 1287, 1296 (N.D.Ga. 2008); Fields v. Harris, 498 F.Supp. 478, 488 (N.D.Ga. 1980). This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive. Lewis v. Callahan, 125 F.3d 1436, 1439-40 (11th Cir. 1997); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987); Hillsman v. Bowen, 804 F.2d 1179, 1180 (11th Cir. 1986); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). "Substantial evidence" means more than a scintilla, but less than a preponderance.  In other words, "substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and it must be enough to

justify a refusal to direct a verdict were the case before a jury.  Richardson v. Perales, 402 U.S. 389 (1971); Hillsman, 804 F.2d at 1180; Bloodsworth, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  Foote v. Chater, 67 F.3d 1553, 1558 (11th Cir. 1995); Walker, 826 F.2d at 999.

Statutory and Regulatory Framework

The Social Security Act's general disability insurance benefits program ("DIB") provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(a). The Social Security Act's Supplemental Security Income ("SSI") is a separate and distinct program. SSI is a general public assistance measure providing an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. Eligibility for SSI is based upon proof of indigence and disability. *See* 42 U.S.C. §§ 1382(a), 1382c(a)(3)(A)-(C). However, despite the fact they are separate programs, the law and regulations governing a claim for DIB and a claim for SSI are identical; therefore, claims for DIB and SSI are treated identically for the purpose of determining whether a claimant is disabled. Patterson v. Bowen, 799 F.2d 1455, 1456 n .1 (11th Cir. 1986). Applicants under DIB and SSI must provide "disability" within the meaning of the Social Security Act which defines disability in virtually identical language for

both programs. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3), 1382c(a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a). A person is entitled to disability benefits when the person is unable to

> Engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner of Social Security employs a five-step, sequential evaluation process to determine whether a claimant is entitled to benefits. See 20 C.F.R. §§ 404.1520, 416.920 (2010).

> (1) Is the person presently unemployed?
>
> (2) Is the person's impairment(s) severe?
>
> (3) Does the person's impairment(s) meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?[1]
>
> (4) Is the person unable to perform his or her former occupation?
>
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986).

The burden of proof rests on a claimant through Step 4. *See* Phillips v. Barnhart, 357 F.3d 1232, 1237–39 (11th Cir. 2004). Claimants establish a *prima facie* case of qualifying disability once they meet the burden of proof from Step 1 through Step 4. At Step 5, the burden shifts to

---

[1] This subpart is also referred to as "the Listing of Impairments" or "the Listings."

4

the Commissioner, who must then show there are a significant number of jobs in the national economy the claimant can perform. Id.

To perform the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity (RFC). Id. at 1238–39. RFC is what the claimant is still able to do despite his impairments and is based on all relevant medical and other evidence. Id. It also can contain both exertional and nonexertional limitations. Id. at 1242–43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy the claimant can perform. Id. at 1239. To do this, the ALJ can either use the Medical Vocational Guidelines, 20 C.F.R. pt. 404 subpt. P, app. 2 ("grids") ,or hear testimony from a vocational expert (VE). Id. at 1239–40.

The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual. Id. at 1240. Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." Id.

## Facts

On April 18, 2007, plaintiff filed an application for a period of disability and Disability Insurance benefits. The agency denied her claim on June 27, 2007, following which she filed a timely Request for Hearing. An Administrative Law Judge ("ALJ") held a hearing on March 4, 2009, and conducted a supplemental hearing on May 1, 2009, to allow plaintiff to obtain representation. The ALJ issued an unfavorable decision on April 29, 2011, finding that plaintiff

suffered from the following "severe"[2] conditions: Coronary Artery Disease, Congestive Heart Failure, Diabetes with Neuropathy and retinopathy, depression, osteoarthritis, and carpal tunnel syndrome.

Plaintiff completed high school and attended three years of college. Her past relevant work includes experience as a licensed practical nurse and a retail manager. At the time of the final decision by the ALJ, plaintiff was 46 years of age.[3] The ALJ determined that plaintiff could not perform her past relevant work but could perform light work with some additional limitations and, based on the opinion of a vocational expert, that there were sufficient jobs in the local and national economy which plaintiff could perform subject to her limitations.

Plaintiff's Testimony

Plaintiff was 45 years of age at the time of her hearing, had a college education and was licensed as an LPN. She claimed disability beginning on May 22, 2006; prior to that time, she had been employed as a nurse at Holman Prison. She testified that she stopped work on that day due to a "legal issue" and decided not to return. She had been thinking of quitting because of health problems including swelling of her feet, pain in her hands particularly when writing at work, complications due to diabetes, and congestive heart failure. She stated that sometimes her blood sugar was so high at work that she would suffer incontinence and vomiting, and other times that it would be so low that she would have to leave a patient and get a snack, but that she

---

[2] An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. § 404.1521(a).

[3] In her written decision, the ALJ also found that plaintiff had suffered a recent history of urinary incontinence but that condition was treated with surgery on March 11, 2009, which was generally successful at relieving the symptoms. Plaintiff also had been diagnosed with possible multiple sclerosis, but that her neurologist ruled out that condition in January 2009.

would have to climb 3 flights of stairs to do so which caused discomfort and problems with her heart.

Plaintiff had carpal tunnel surgery on her left hand. She testified that one her doctors, Dr. Bassam, told her not to have the surgery because the carpal tunnel problems were related to her diabetes and that surgery would not help. However, another doctor, Dr. Smith, convinced her to try it. The surgery helped some, relieving some of her pain, but she still dropped things. When the neuropathy gets bad, she can not feel what is in her hand. Doc. 12 at 52. Dr. Smith also prescribed therapy for her shoulder, but that after three weeks, she still had limited range of motion. One of the exercises she was to do at home involved leaning over a table, but after she complained that this caused a burning pain in her lower back, the doctor told her that she might have a bulging disc in her back.

Plaintiff testified that she had suffered from diabetes for 42 years. She stated that she lived with her mother, aged 82, and her two children, ages 16 and 7; that she was able to drive, but that, while driving on one prior occasion, she almost hit a car she did not see because of her vision problems and therefore wasn't comfortable driving and avoided driving alone. She thus generally had her mother or daughter ride with her when she drove.

She estimated that she can lift a 5 pound bag of potatoes using both hands but 10 pounds gets difficult because her wrist cannot take it and she cannot lift things very high because of her shoulders. She stated that she does well with sitting as long as her legs are raised, because it helps with her heart problems and with the constant neuropathy pain in her feet. However, she gets stiff when she sits for more than 20-30 minutes at a time. She testified that she can stand for five minutes to do the dishes, but has to keep stopping to sit, and that she gets short of breath if

she walks too fast or walks farther than about fifty feet. She testified that she has to sit down in the grocery store about three times per hour.

Plaintiff also stated that she has problems with her hands: she can hold a cup of coffee with both hands if she is careful, but that she drops things, mostly with her left hand but with her right sometimes as well. She can no longer cut her own toenails, so she has to pay to have it done. She states that she cannot use buttons and wears button-down blouses only when her daughter can help her get them on. She can not put on her own socks, so she wears socks only in the winter. She compensates for these limitations by wearing clothes made of stretch materials that she can slip on and off, and by wearing slip-on shoes. She says that after doing laundry and dishes, she is worn out and takes a nap for two to three hours.

Plaintiff testified that her blood sugar goes up and down all the time, and that she still has problems with neuropathy, blurred vision, heart problems, kidney problems, and retinopathy. Her doctors had referred to her as being a "brittle" diabetic, meaning that her blood sugar is particularly hard to control. She has fallen several times and was told that it was due to her neuropathy. She also has arthritis in her left knee so she can not get back up when she falls or kneels.

Plaintiff indicated that she could not take certain medications, including pain medications, because her doctors were worried about their effect on her kidneys. Her kidney specialist[4] took her off Darvocet for that reason. She was given Lortab after the surgery, but was taken off that pain medication quickly because of the kidney problems. She is prescribed Ultram, but still suffers a great deal of pain. She can not take non-steroidal anti-inflammatory

---

[4] Plaintiff has proteinurea, chronically high levels of protein in her urine, and stated that she has been informed that she has stage one kidney disease.

drugs. The ALJ asked plaintiff about side effects from her medications: plaintiff stated that she was tired all that time and had been told that could be due to her Neurontin; however, when her doctor took her off that medication, she remained tired so they put her back on. She takes a nap every day. The Lasix makes her urinate frequently, but she still has swelling in her legs. She is on insulin but still has wide swings in blood sugar. Plaintiff stated that she had some memory problems. She stated that she had undergone treatment for depression, but stopped talking the medications about a year prior to the hearing. She reported that she sometimes gets 'really low,' but that most of the time is 'okay.'

She testified that her low blood sugar would cause her to black out "a lot," id. at 52. Dr. Yoder's physician's assistant, Ms. Janessa Quinley, disputed this report when told about it by plaintiff and her mother. Ms. Quinley said that, if plaintiff had suffered a series of comas, as her mother claimed, she would be in the hospital. Even if they were blackouts, as claimed by plaintiff, Ms. Quinley also argued that, if they were blackouts as claimed by plaintiff, she could only come out of a blackout if fed sugar, and she would be unable to swallow. However, plaintiff's mother told Ms. Quinley that she would put a dab of sugar on the end of her finger and put it in plaintiff's mouth; once the sugar dissolved, it would get plaintiff conscious enough that she could drink something containing more sugar. Whether the dab of sugar or the passage of time remedied the problem is unclear.

Shortly before the Social Security hearing, plaintiff underwent a heart catheterization performed by Dr. Fanchez [phonetic] at Cardiology Associates. The doctor said that she had a blockage, but that medication was the only thing they could do for it because her blood vessels had shrunk due to her diabetes and that a shunt would risk rupturing her blood vessels. He also did not recommend bypass surgery at that time. Dr. Fanchez prescribed medication for this

9

condition, but as it cost approximately $200 per month and was not covered by Medicaid, she could not afford it.

The ALJ noted that plaintiff's records contained some notes about non-compliance with her prescribed diabetic medication. Plaintiff explained that, for several years, she could not find a specialist to treat her diabetes who would accept Medicaid, and so was being followed by her family doctor, Dr. Yoder, who did not "follow[] me real strictly." Id. at 49. Her nephrologist, Dr. Myer, was upset about her high readings. However, plaintiff eventually started seeing a neurologist who changed the type of insulin prescribed and adjusted the dosage she was taking. Plaintiff reports that she is currently compliant with the medications and, while they help, her blood sugar remains highly variable. As an example, she stated that her blood sugar was 285 on the morning of the hearing, which while generally considered high was low for her, and that it got as low as 80 between lunch and supper the day before.

Medical Records

Plaintiff's primary care physician was Dr. Jonathan E. Yoder. In January 2007, he treated her for edema in both feet; that treatment continued on March 2 and March 28, 2007, when it was noted that plaintiff wanted to discuss getting disability benefits. His notes state that plaintiff has "a lot of problems associated with cardiac disease, high blood pressure, hypercholesterolemia and poorly controlled diabetes." He states that he thinks she would be a candidate for disability but that she would have to investigate benefits for herself.[5] Plaintiff

---

[5] Plaintiff underwent an electrocardiogram which revealed normal sinus rhythm and other abnormality of indeterminate age, and a cardiolite stress test which was 'equivocal.' Dr. Richard J. Chernick, the cardiologist who performed the test, stated that the test showed a small area of inferospical reversibility that appeared to be more consistent with attenuation shift[, but that i]schernia appeared to be much less likely." Doc. 12 at 289. In addition, during the same period, plaintiff had a brain magnetic resonance imaging (MRI) test which revealed nonspecific abnormalities possibly "just" related to vascular disease; a brain computerized tomography (CT) scan revealed prominent vertebral artery disease and
(Continued)

10

relies heavily on a Clinical Assessment of Pain form completed on March 5, 2009, by Dr. Yoder's office.[6]

Dr. Yoder referred plaintiff to Dr. Katharina V. Meyer, a nephrologist, who first saw plaintiff on May 16, 2007, to be seen for proteinuria, edema, and stage one chronic kidney disease. Plaintiff at that time was taking Humulin, Zyprexa, Vytorin, Synthroid, Lasix, Zaroxolyn, Lopressor, Spironolactone and Darvocet. Dr. Meyer added Benicar for blood pressure and proteinuria, insulin, and the Humalog pen so plaintiff could take insulin at lunchtime.

On June 15, 2007, Jill Hall, PhD, performed a psychological consultive examination and diagnosed plaintiff as suffering from adjustment disorder with depressed mood. She gave the opinion that plaintiff

> may have difficulty with the pressures of an ordinary work setting from a psychological point of view due to some depression and a multitude of physical problems. She has the ability to understand, carry out and remember instructions at this time and should be able to respond appropriately to supervision and coworkers.

Dr. Hall stated that, though plaintiff should continue mental health treatment for depression, "her claim is much more of a physical nature than a psychological one."

Plaintiff saw a neurologist, Bassam A. Bassam, M.D., on January 2, 2009, for complaints of upper extremity pain and left hand disfunction, and lower extremity issues such as bilateral foot numbness and tingling. Dr. Bassam diagnosed plaintiff with likely diabetes-related

---

other, more questionable abnormalities (Tr. 531); an echocardiogram which showed overall preserved left ventricular function and the absence of significant valvular regurgitation (Tr. 528-530); and a carotid duplex scan which revealed right carotid artery thickening without hemodynamically significant stenosis (Tr. 532).

[6] A physician's assistant at Dr. Yoder's office completed the forms for Dr. Yoder's signature

peripheral polyneuropathy and likely musculo-skeletal difficulties causing the upper extremity pain.  Dr. Bassam adjusted plaintiff's medications and ordered testing, which showed moderate to severe polyneuropathy, left carpal tunnel syndrome and ulnar neuropathy.  He prescribed a wrist brace for plaintiff to wear.

Dr. Jeff Fahy, a gynecologist, treated plaintiff between February 19, and April 10, 2009, for urinary incontinence.  He performed endometrial ablation on an endocervical polyp discovered during testing and also implanted a 'mini-arc device' to help with the incontinence.

Analysis

Residual Functional Capacity

Plaintiff's first claim on appeal is that the ALJ's RFC determination was not supported by substantial evidence.  Plaintiff cites what she refers to as the improper rejection of the opinions of plaintiff's treating physician, Dr. Yoder, and substitution of the ALJ's medical opinion.  Plaintiff argues that ALJ stated that Dr. Yoder's treatment notes did not rule out work but failed to seek clarification from Dr. Yoder over the purported difference between the treatment notes and his opinion letter.

> [A] treating physician" opinion about the nature and severity of a claimant's impairment is generally given controlling weight if it is well supported and is not inconsistent with the other substantial evidence. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is given "substantial or considerable weight unless 'good cause' is shown to the contrary." Phillips [v. Barnhart], 357 F.3d [1232] at 1240 [11th Cir. 2004)]. Good cause exists when: (1) the treating physician's opinion is not bolstered by the evidence; (2) evidence supports a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the physician's own medical records. Id. at 1240–41.

Silverio v. Commissioner of Social Security, 461 Fed.Appx 869, ___ *3 (11th Cir. 2012).

With regard to the Clinical Assessment of Pain form and the Diabetes Questionnaire, the ALJ found them entitled to little weight.

> While these forms were completed by an "other" medical source and an "acceptable" treating source, they contain vague statements with very little explanation of the evidence relied on in forming the opinions.[7] Both forms contain equivocal language acknowledging that [] the opinions were heavily based on the subjective report of symptoms and limitations provided by the claimant. The claimant presented to Ms. Quinley on March 5, 2009, with the chief complaint of "I need my disability papers filled out." Ms. Quinley noted the claimant said her symptoms are "pain 'level C on the papers' i.e. inhibit ADLs/functioning at work." In the Diabetes Questionnaire, when asked to give an opinion on the claimant's ability to work, Ms. Quinley stated that it "depends on activities required for specific employment." Ms. Quinley further stated that the answers given were "based on patient current report and the objective data from her record in our office only." In the CAP form, when asked whether the claimant can engage in employment, Ms. Quinley answered "probably not, based on patient report." Further, Ms. Quinley noted in connection with completing the forms that "she should seek employment as long as she can function in available job capacities, in order to stay active [and] delay declining status."
>
> However, the undersigned [h]as considered the opinions rendered in Dr. Yoder's records in conjunction with the treatment notes, and finds that they support the conclusion that the claimant is limited to performing no more than light work. The undersigned does not read these opinions as ruling our work, and whatever implication there is to that conclusion is not accepted as it is not supported by the treatment notes. The undersigned also notes that the March 5, 2009, office visit when the claimant requested the disability forms be completed, Ms. Quinley stated in her review that the claimant first mentioned "frank 'pain' in our records" was in July, 2007; and it has not been a consistent complaint during encounters.

Doc. 12 at 30.

As set forth above, this court is bound by a highly deferential standard of review in considering the decision of the ALJ. The court may not make its own findings nor re-weigh the evidence. In this instance, the ALJ's refusal to give controlling weight to the two forms completed by Dr. Yoder's office is supported by substantial evidence, which the ALJ detailed in the written decision. The ALJ did not discount any other submissions from Dr. Yoder's office, and expressly relied on the treatment notes. The ALJ cited language from within the forms as

---

[7] As with all such forms, the responses are multiple choice or short answer, without provision for explanation except for a comment section at the end.

well as portions of the treatment records of Dr. Yoder; this evidence is facially sufficient under binding precedent to justify giving those opinions less than controlling weight. Nor does the court find that the equivocal language in those forms—as found by the ALJ—required the ALJ to seek clarification from Dr. Yoder; the language used is adequately clear and the mere fact that the ALJ found that Dr. Yoder's treatment records did not support his conclusions in the two forms does not automatically require "clarification." Accordingly, the court finds that plaintiff's first assignment of error does not justify remand.

Light Work

Plaintiff also argues[8] that the ALJ's RFC finding that plaintiff could perform light work was not supported by substantial evidence particularly where the ALJ also found that plaintiff had limitations within the range of light work. Plaintiff states that the ALJ "failed to cite any evidence from acceptable medical sources to support her own medical opinion" and provided no explanation for her finding.[9]

The ALJ found that plaintiff suffered the following limitations due to depression, pain and diabetic neuropathy: she can lift and/or carry up to 20 pounds occasionally and 10 pounds frequently; can stand or walk and can sit for up to 6 hours each in an eight hour day, with regular breaks and the opportunity to alternate positions after 30 minutes; can bend forward with her

---

[8] Plaintiff's argument lacks significant development. The brief on this point consists of a block quote from Social Security Ruling 83-10 defining the terms "light work" and "frequent;" a statement that "Social Security Ruling 83-12 provides that light work does not include sit/stand jobs;" and two sentences restating the issue. This theory was not developed further at oral argument.

[9] Plaintiff argues that the ALJ's decision is internally inconsistent because the ALJ rejected the opinions of Dr. Yoder but relied on his treatment notes. The court finds no such inconsistency as the ALJ rejected the opinions contained in the two forms completed by Dr. Yoder's office staff, but did not reject the treatment notes or the opinions contained therein.

head down occasionally; can reach overhead with her left arm rarely. Her diabetic retinopathy limits her ability to work in a job that requires good far distance vision. Her mental impairments preclude semi-skilled and skilled jobs, but the ALJ found that plaintiff can understand, remember and carry out simple repetitive tasks, attend for 2-hour periods, and adapt to infrequent changes in the work setting. As a result of these limitations, the ALJ determined that plaintiff could perform "a restricted range of light work." Doc. 12 at 27-30. There is no indication that the ALJ erroneously ignored the limitations she had found, as argued by plaintiff; the ALJ's determination specifically included those limitations and found that plaintiff was limited to a "restricted range" of jobs within the light work category.

At the hearing, the ALJ asked the Vocational Expert four hypothetical questions, for all of which the VE testified that there were available jobs. Doc. 12 at 63-65.[10] These hypotheticals addressed the RFC findings made by the ALJ in her decision and did not simply reiterate a general limitation to light work. The court does not take plaintiff's second grounds for appeal as challenging the ALJ's finding of any individual limitation; the plaintiff's general objection and her arguments raised in support of that challenge do not reach that far. Nonetheless, it appears that the limitations found by the ALJ were supported by specific findings in the record. Plaintiff's second grounds for appeal is due to be denied.

## Conclusion

For the foregoing reasons, it is hereby ORDERED that plaintiff's appeal is DENIED and that judgment shall be entered for defendant.

---

[10] In addition, the plaintiff's representative asked two further hypotheticals, the first giving credence to plaintiff's testimony that she had to nap for 2-3 hours each day, and the second based on a finding that movement would cause distraction from or total abandonment of task. In those instances, the VE stated that there would be no available jobs. Id. at 66-67.

DONE this the 28th day of June, 2012.

                                                /s/  Katherine P. Nelson
                                                UNITED STATES MAGISTRATE JUDGE